IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

DEC - 7 2018

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | |
| JOSE JUAN JIMENEZ, ) | Case No. 1:18-MJ-581 |
| DAVID BRITO DE LEON aka ERWIN, ) | |
| REYNALDO CASTILLO, ) | |
| MELVIN MICHAEL HILDALGO ACOSTA ) | |
| RAUL ANTONIO SURIEL, and ) | |
| DAVID JAYRET SURIEL ) | |
| Defendants. ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Daniel Son, Special Agent of the Drug Enforcement Administration, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION

1. I submit this affidavit in support of a criminal complaint charging JOSE JUAN JIMENEZ, DAVID BRITO DE LEON aka "ERWIN", REYNALDO CASTILLO, MELVIN MICHAEL HILDALGO ACOSTA, RAUL A SURIEL, and DAVID JAYRET SURIEL with conspiracy to distribute and possess with intent to distribute a controlled substance, which was in fact five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(A)(ii).

2. I am a Special Agent with the Drug Enforcement Administration ("DEA"). I have been employed as Special Agent with the DEA since 2015. I was previously assigned to the New York Division Tactical Diversion Squad. Since 2017, I have been assigned to the

Washington Division Office Tactical Diversion Squad. I have participated in the execution of numerous search warrants and have sworn to numerous affidavits in support of arrest warrants and search warrants for illegal narcotics, paraphernalia related to the use of illegal narcotics, monies or proceeds derived from the sale of narcotics, and records, ledgers and documents pertaining to the purchase and sale of controlled substances.

3. I have conducted and participated in numerous narcotics-related investigations resulting in the arrest and conviction of drug distributors, and seizures of controlled substances. Many of these investigations have involved the distribution and use of cocaine, cocaine base, heroin, and 3, 4 methylenedioxymethamphetamine (MDMA), fentanyl, oxycodone, hydrocodone oxymorphone, buprenorphine, alprazolam, and amphetamine mixtures. I have received extensive training in drug identification, drug distribution methods, and drug enforcement techniques from both federal and state agencies. As a result, I am familiar with the use, effects, distribution techniques, appearance, and method of manufacture of controlled substances.

4. I am familiar with the facts and circumstances of this investigation from: (a) my personal knowledge of the investigation; (b) observations of other law enforcement officers; (c) information provided to me by other law enforcement officials; and (d) information otherwise obtained by credible and reliable sources. This affidavit is being submitted for the limited purpose of obtaining a criminal complaint. As a result, it does not include each and every fact observed by me or known to the government. When I assert that a statement was made by an individual, that statement is described in substance and in part, but my assertion is not intended to constitute a verbatim recitation of the entire statement. All observations referenced below that were not personally made by me were related to me by the

persons who made such observations.

## BACKGROUND

5. Throughout the course this investigation, law enforcement utilized a confidential source (hereinafter, "CS") and undercover law enforcement officers from the DEA and the Virginia State Police (hereinafter, "UCs") to obtain information. Both the CS and UCs will be referenced throughout this affidavit in the masculine gender regardless of their true gender.

6. When possible, statements made by the CS have been corroborated through various investigative techniques, to include analysis of phone toll records, recorded phone conversations, and various surveillance techniques. The CS has provided information to the DEA in exchange for monetary payments in connection with numerous investigations. The CS does not have any criminal convictions. To the best of my knowledge, none of the information that the CS has provided to law enforcement has proved to be false, misleading or inaccurate in any material respect. For these reasons, I have deemed the CS's information to be reliable.

## PROBABLE CAUSE

7. Through debriefings with the CS, law enforcement learned that JIMENEZ and ERWIN traveled from Pennsylvania to the Eastern District of Virginia on or about September 24, 2018 to obtain 25 kilograms of cocaine in exchange for $270,000 United States dollars in cash.

8. On or about September 2018, the CS has been in contact with ERWIN, a multi-kilogram cocaine broker who can set up meetings with the CS and potential buyers. Under the direction of law enforcement, the CS contacted ERWIN to arrange a meeting

3

between the CS and ERWIN.

9. On or about September 24, 2018, at the direction of law enforcement, the CS and a DEA Special Agent acting in an undercover capacity (hereinafter, "UC-1") met with ERWIN and JIMENEZ to discuss the possible purchase of approximately twenty-five (25) to twenty-seven (27) kilograms of cocaine to take from in or about Northern Virginia to Pennsylvania. The meeting was surveilled and recorded by law enforcement. ERWIN was observed driving a black Land Rover Range Rover SUV bearing Pennsylvania State license plates K22517K. The registration on the vehicle came back to Evilily Auto Sales Inc. with the address of 1015 W 15th Street Rear, Hazleton, PA 18201.

10. During the September 24, 2018 meeting, in substance and in part, the CS and the UC negotiated the sale of twenty-five (25) to twenty-seven (27) kilograms of cocaine for $27,000 per kilogram with ERWIN. During the same meeting, ERWIN stated to the CS that he cut the kilos once purchased from CS. Based on my training and experience, I believe that ERWIN was explaining to the CS that he mixes the cocaine with an adulterant to dilute the cocaine so that he can increase the volume for distribution. ERWIN also asked the CS if he could get some credit from the CS for the purchase.

11. Also during the September 24, 2018 meeting, in substance and in part, ERWIN told the CS that he will go back to Pennsylvania and call back in the near future to coordinate the purchase. At the end of the conversation, the CS and ERWIN agreed to complete the purchase in person in order to further their relationship and possibility for additional purchases.

12. On or about October 17, 2018, ERWIN texted the CS from a new telephone number. The CS confirmed that this telephone number was indeed ERWIN's. In substance

4

and in part, ERWIN stated to the CS that this telephone number was his new phone number and for the CS to saved it.

13. On November 17, 2018, the CS contacted ERWIN to coordinate the purchase of 20 to 25 kilograms of cocaine on or about December 2, 2018. In substance and in part, ERWIN told the CS that he can easily move 50 kilograms of cocaine to what the CS responded he was willing to start him with the 20 to 25 kilograms of cocaine and later sell him another 20 kilograms on credit.

14. On November 30, 2018, ERWIN contacted the CS and advised he was able to obtain money for 10 kilos and that an associate of ERWIN'S would be obtaining additional funds to purchase more kilos. ERWIN advised that he would be calling the CS to confirm how much money they would have ready for the meeting. On December 2, 2018, follow-up contact was made to confirm that the parties would meet on Thursday, December 6, 2018 and that ERWIN had money for 10 kilos but anticipated having additional funds for additional kilos. ERWIN requested additional kilos on consignment, and the actual amount of credit would be discussed pending the additional money he could acquire.

15. On or about December 6, 2018, the CS and a DEA Task Force Officer acting in an undercover capacity (hereinafter, "UC-2") met with four individuals identified as JIMENEZ, BRITO DE LEON aka ERWIN, HIDALGO ACOSTA, RAUL SURIEL at a hotel in Chantilly, Virginia within the Eastern District of Virginia. All parties entered the hotel to discuss the deal further in the lobby. REYNALDO CASTILLO, the driver of a gray Hyundai SUV with Pennsylvania plates K22517K remained in the vehicle parked in the hotel parking lot. RAUL SURIEL attempted to take control of how the deal was to occur. UC-2 stated that RAUL SURIEL's "money man" would arrive and go up to the room with the CS and ensure

5

the money was correct at which time the CS would call the UC-2 to take RAUL SURIEL or one of his designees to where the kilograms of cocaine were. All parties agreed to the plan by acknowledgement of non-verbal validation ques, such as head nods as instructions were given by UC-2.

16. Shortly thereafter, RAUL SURIEL placed a call to his money man and advised him to come to the hotel. RAUL SURIEL stated that his driver would be there in 15 minutes. At this time, all parties relocated to the hotel's courtyard where all parties engaged in small talk as well as narcotics talk. RAUL SURIEL was notified by phone that his driver had arrived. RAUL SURIEL then instructed JIMENEZ, BRITO DE LEON aka ERWIN, and HIDALGO ACOSTA to stay in the courtyard as to not draw attention.

17. RAUL SURIEL, CS and UC-2 then exited the front of the hotel and DAVID SURIEL, the driver of a gray Hyundai SUV bearing New York plates HMR9905, parked to the right side of the hotel. RAUL SURIEL, CS and UC-2 walked over to the vehicle and RAUL SURIEL told the CS to get in the car to count the money. CS advised RAUL SURIEL that the CS did not want to count the money in public and had a secured a hotel room in order to count the money.

18. RAUL SURIEL, CS and UC-2 then re-entered the hotel and went up to the CS' room. UC-2 stated to RAUL SURIEL for the money man to come up with the money and stay with the CS to count while the UC-2 takes RAUL SURIEL to inspect the merchandise. RAUL SURIEL agreed and asked the UC-2 to take the room key to the money man which he referred to as his little brother. The UC-2 then obtained the key from the CS and went back down to DAVID SURIEL and handed him the key. The UC-2 observed DAVID SURIEL attempting to access a hidden compartment in the vehicle, where the money was being stored. The UC-2

and DAVID SURIEL then walked into the hotel and went up to the room with the money.

19. Once in the room, DAVID SURIEL and the CS remained, while RAUL SURIEL and UC-2 went back out. UC-2 took RAUL SURIEL to the UC-2 vehicle containing two duffle bags each containing eleven kilograms of cocaine. UC-2 opened the rear tail gate and unzipped both the duffel bags exposing the visible kilograms of cocaine. UC-2 handed one duffel to RAUL SURIEL and he took possession of the bag and began to place it in the front driver's seat in order to inspect the kilograms of cocaine. UC-2 then gave the audible and visible arrest signals. UC-2 then walked over to the front passenger side and opened the door. UC-2 asked RAUL SURIEL where he wanted the other duffel bag to which RAUL SURIEL replied in the rear passenger seat. As the UC-2 was attempting to get the second duffel bag, arrest teams arrested RAUL SURIEL, while simultaneously arresting DAVID SURIEL in the room, CASTILLO in the Hyundai SUV, and JIMENEZ, BRITO DE LEON aka ERWIN, and HIDALGO ACOSTA in the courtyard without incident.

## CONCLUSION

20. Based on the facts set forth above, I submit there is probable cause to believe that, on or about December 6, 2018, within the Eastern District of Virginia and elsewhere, JOSE JUAN JIMENEZ, DAVID BRITO DE LEON aka ERWIN, REYNALDO CASTILLO, MELVIN MICHAEL HILDALGO ACOSTA, RAUL ANTONIO SURIEL, and DAVID JAYRET SURIEL conspired to distribute and possess with intent to distribute a controlled substance, which was in fact five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(A)(ii).

Daniel Son
Special Agent
Drug Enforcement Administration

Sworn and subscribed to before me this ____ day of December, 2018.

/s/
Michael S. Nachmanoff
United States Magistrate Judge
The Honorable Michael S. Nachmanoff
United States Magistrate Judge